PATRICK C. WILSON, ESQ.  (SBN 100487)
SCHOOL AND COLLEGE LEGAL SERVICES OF CALIFORNIA
5350 Skylane Boulevard
Santa Rosa, California  95403
(707) 524-2690
(707) 578-0517 FAX
pwilson@sclscal.org

Attorneys for the SONOMA COUNTY JUNIOR COLLEGE DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROJECT DEVELOPMENT GROUP, INC., a Pennsylvania corporation<br><br>          Plaintiff,<br><br>vs.<br><br>SONOMA COUNTY JUNIOR COLLEGE DISTRICT, of the County of Sonoma, State of California,<br><br>          Defendant.<br><br>AND COUNTERCLAIM. | CASE NO:  C 07-02987 WHA<br><br>**SONOMA COUNTY JUNIOR COLLEGE DISTRICT'S OPPOSITION TO MOTION FOR PROTECTIVE ORDER**<br><br>Hearing Date: 11/27/07<br><br>Time:    10:00 a.m. |

The Sonoma County Junior College District ("College District") hereby responds to PDG's motion for a protective order.

On September 18, 2007, the College District answered PDG's amended complaint and filed a counterclaim for, inter alia, two false claims under the California False Claims Act. (See the counterclaim at paragraphs 16-26.)  PDG answered the counterclaim and raised various affirmative defenses.

-1-

Since then, the parties have engaged in discovery including mutual document requests.

Recently, counsel for the College District learned that, several months ago, PDGE[1] filed with the SEC a Form 10-Q that revealed at "item 4" that fraudulent activities had recently occurred at one PDGE "remote location" with the "opportunity" for other fraudulent activities occurring at other unspecified remote locations.  The fraudulent activities included billing customers for work not performed and related misconduct.[2]  Because the reference in item 4 of the Form 10-Q was vague regarding the full extent of the fraud at PDGE, discovery was propounded on this subject, which is now the subject of PDG's motion for a protective order.

The parties conferred regarding this discovery dispute via email in mid-November and a detailed email was sent by the College District's counsel to PDG's counsel on this subject on November 14, 2007, a copy of which is attached to the Wilson Declaration as Exhibit 7.[3]  Because that November 14, 2007, email was not mentioned by PDG in its moving papers and because it is relevant to the pending motion, it is quoted below in full:

"You have asked how the discovery relating to the PDGE 10-Q report filed by PDGE with the SEC is relevant to any claim or defense, or is propounded to lead to the discovery of relevant evidence.

PDG was the low bidder on the asbestos abatement project at the College District with a bid of **$127,300**.

As I indicated to you in my email dated November 9, 2007, I have reviewed all of the documents that you produced on behalf of PDG and I could not find *any* document that shows how PDG calculated its bid.  I asked you in that email to advise me if you in fact had produced those documents.  You have not replied so I assume that the bid preparation documents no longer exist.  This absence of any bid preparation documentation is highly irregular.  I would like an explanation.

You did produce a document (#108) from PDG to its bonding company dated 9/6/06 that shows that, just two working days before bid date, PDG had calculated its bid for this project as **$173,300**.  However, I could not

---

[1] As discussed further in the Wilson Declaration at paragraph 3, PDG is doing business in California as PDGE.
[2] An extract of the Form 10-Q is attached to the Wilson Declaration as exhibit 3.
[3] Counsel for the College District was not available to meet and confer regarding this matter during the week of November 19, 2007, because counsel was on a family vacation that entire week.  See the Wilson Declaration at paragraph 15.

-2-

Opposition to Motion for Protective Order
C 07-02987 WHA

locate any other documents showing how this bid amount was calculated (that is, what scope of work was assumed etc.).

The 9/6/06 bid amount was $46,000 higher than the final bid submitted by PDG. I have located no documents that show why PDG reduced its bid by 27%. What is of particular interest is that the reduced bid of $127,300 was less than the profit identified in document number 108. Why would PDG bid the College District job at a loss? Any why wouldn't PDG have any documentation as to this bid calculation?

One reason to bid a job at a loss is to be the low bidder and then to make questionable claims during the job to try to make a profit.

One reason not to keep documentation as to how the bid was calculated is to eliminate evidence that shows that, for example, a later claim of "extra work" was in fact work that was factored into the bid.

As you know, the College District has alleged two false claims in its counterclaim. In each instance, the District alleges that PDG claimed as extra work work that was within the scope of the contract. The District alleges that PDG knew these claims were false, acted in deliberate ignorance of the truth or in reckless disregard for the truth.

The discovery I sent you is probative to these issues. The 10-Q report indicates that PDG "remote locations" engaged in pervasive fraud, including fraudulent billings to customers. The Santa Rosa project was bid by a "remote location", that is the Las Vegas office and we allege that PDG made false claims.

I'd like to know the full extent of the fraud discussed in the 10-Q report. This discovery may well show that the remote offices felt pressured to increase revenues due to PDG's fiscal problems to the extent that they low balled bids and then engaged in what PDGE has admitted was a fraudulent course of conduct. One reason to do this would be to generate extra revenue at a time when PDG was in financial trouble. Thus, this discovery would support the claim that PDG knowingly submitted false claims to the College District."

The College District never received a response to this email.

### The Legal Standard for Permissible Discovery

The scope of permissible discovery is defined by the Federal Rules of Civil Procedure.

Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). While Rule 26 (b) was amended in 2000, most courts that have addressed the scope of the new rule find that Rule 26 still contemplates liberal discovery and that relevancy under Rule 26 is extremely broad. *U.S. EEOC v. Caesars Entertainment, Inc.* 237 F.R.D. 428, 431 (D. Nev. 2006). *See also Greene v. Dupont* 2002 WL 32349387 (E.D. Penn. 2002)

-3-

(where the Court distinguishes the *Micro Motion* case relied upon by PDG in this case and holds that "discovery rules are to be accorded broad and liberal construction").

When a party seeks a protective order seeking to prevent discovery, as PDG has done in this case, the burden of persuasion is on the party seeking the protective order.   The party must point to specific facts that support the request as opposed to conclusory or speculative statements. 237 F.R.D. at 432. As discussed in further detail in the attached Wilson Declaration, the requested discovery at issue in this case is relevant, or may lead to the discovery of relevant evidence, and PDG's objections are too generalized to withstand scrutiny.   Therefore, PDG has failed to meet its burden of proof and the motion for a protective order must be denied.

Dated: 11-26-07

SCHOOL AND COLLEGE LEGAL SERVICES
OF CALIFORNIA

By: _____
     Patrick C. Wilson
     Attorney for the Sonoma County
     Junior College District

-4-

Opposition to Motion for Protective Order
C 07-02987 WHA

PATRICK C. WILSON, ESQ. (SBN 100487)
SCHOOL AND COLLEGE LEGAL SERVICES OF CALIFORNIA
5350 Skylane Boulevard
Santa Rosa, California 95403
(707) 524-2690
(707) 578-0517 FAX
pwilson@sclscal.org

Attorneys for the SONOMA COUNTY JUNIOR COLLEGE DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PROJECT DEVELOPMENT GROUP, INC., a Pennsylvania corporation | CASE NO: C 07-02987 WHA |
| Plaintiff, | |
| vs. | DECLARATION OF PATRICK C. WILSON IN OPPOSITION TO PDG'S MOTION FOR A PROTECTIVE ORDER |
| SONOMA COUNTY JUNIOR COLLEGE DISTRICT, of the County of Sonoma, State of California, | |
| Defendant. | |
| AND RELATED COUNTERCLAIM. | |

I, Patrick C. Wilson, declare:

1.     I am the attorney for the College District in this matter. I have personal knowledge of the

facts stated below unless otherwise indicated.

-1-

2.    PDG was the low bidder on the Plover library asbestos abatement contract with a bid of $127,300.  The scope of work for this contract required PDG to demolish and remove shelving, furnishings and other soft items in the Plover library in Santa Rosa and then to abate and remove the acoustical texture on the ceiling of the library and to abate certain floor tiles, which contained asbestos.

3.    PDG's bid for this project was prepared out of PDG's Las Vegas office, which I believe is a "remote location" for PDGE, which is located in Pennsylvania. While PDGE is apparently the parent company of PDG, PDG is doing business in California as PDGE according to its California contractor's license.  Moreover, the terms "PDG" and "PDGE" have frequently been used interchangeably by PDG.  (See the documents attached at exhibit 1.)

4.    On September 18, 2007, on behalf of the College District, I filed an answer to PDG's amended complaint and, at the same time, I filed a counterclaim that alleged that, inter alia, PDG made two false claims to the College District in connection with the asbestos abatement contract that is the subject of this action. Both false claims involved claims for money for "extra work" that represented work that was in fact within the scope of the contract.  PDG answered the counterclaim on October 9, 2007.

5.    In October, 2007, while researching PDG on the internet, I found that PDGE's stock was being traded at a price that was around $1 per share (see, for example, the attached exhibit 2 which shows that PDGE's most recent share price was 80 cents a share).   Further research located a Form 10-Q filed by PDGE with the SEC several months ago.  This Form indicated that PDGE was having financial difficulty, especially in the year 2006, which is when the subject project was bid by PDG. On page 22 of the Form 10-Q, under item 4, PDGE disclosed that in mid to late 2006, apparently

-2-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

around the same time PDG was bidding for the College District asbestos abatement project,

unspecified "remote locations" of PDGE had "material weaknesses" such that general managers of

the unspecified remote locations had the "opportunity" to "engage in fraudulent activities, including

fraudulent billing to customers for work never performed" and other improper activities.  (A true

copy of item four to the Form 10-Q, obtained from the internet, is attached hereto as exhibit 3.)

### No Pre-Bid Document Has Been Produced by PDG

6.      In my experience, contractors prepare written bid documents that show how they calculate

their bid price.  The written material shows what scope of work was assumed, what labor hours

were assumed, and what materials and equipment prices were anticipated, along with a mark up for

profit. The sum of these figures equals the bid.  For example, I received from Bill Deadman, the

estimator for one of the other bidders on the Plover library project, a written document that he

prepared which is attached hereto as exhibit 4.  This document by Mr. Deadman shows that his bid

included, for example, money for the "demo" of carpet, tubes and ballasts, lights, shelving, doors

and other items in the library.  These demo costs appear to be the same items that PDG has claimed

as "extra work" outside the scope of the contract, as further described in the fourth counterclaim.

7.      As part of the College District's document discovery in this case, I requested that PDG

produce, among other documents, its pre-bid document showing how it arrived at its bid price of

$127,300.  Although PDG produced numerous documents, and I have reviewed all of them, I could

not find any document that reflected how PDG arrived at its $127,300 bid. All I found was a

document to a bonding company showing that PDG estimated its project costs and profit at

$173,300, or $46,000 *higher* than its low bid. See exhibit 5. Since this indicates that PDG bid this

-3-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

job at a significant loss, I hoped to find a document that showed how or why PDG's bid dropped by $46,000 to $127,300. However, no such document was located.

8.    I contacted PDG's attorney on November 9, 2007, and asked him where the pre-bid documents were located. (A copy of that email is attached as exhibit 6.) I did not receive any response. On November 14, 2007, I again emailed Mr. Taylor and asked for an explanation regarding why no pre-bid estimate was given to me as part of the PDG document production. I did not receive a response. (See exhibit 7.)

### The Discovery at Issue

9.    Since item 4 of PDGE's Form 10-Q states that that at least one of PDGE's "remote locations" had defrauded customers in or about the same time the College District alleges that PDG submitted false claims to the College District, I prepared discovery to PDG on this subject. Set forth below is a description of the discovery that is the focus of PDG's motion for a protective order with brief comments regarding relevancy and burden.

### Request for Admission No. 2

**No. 2.**   Admit that the Form 10-Q attached to the discovery request (which was downloaded from the internet) is a true and correct copy of the report PDGE filed with the SEC.

**Comment:**  This Form at item four indicates that PDGE remote offices appeared to have been engaging in fraud at around the same time that PDG was bidding the College District's asbestos abatement contract. It also indicates that PDGE was in financial difficulty at the same time. The College District asked that the Form be authenticated so that further discovery could be pursued on this matter. In particular, the College District is interested in discovering whether PDG low balled its bid to win the contract and then, as part of an apparent practice of engaging in

-4-

fraudulent activities by PDG remote offices to boost revenues, submitted false claims to the College

District to try to compensate for its below cost bid. Since the College District is simply asking that

PDG admit that the Form attached to the discovery is true and correct, it is difficult to see how

responding to this request can be any burden at all.


### Interrogatories 13-20

No.13.  Explain the relationship between the Project Development Group, Inc. and PDG

Environmental, Inc.

**Comment:** This interrogatory seeks clarification of the relationship between the two entities.

As noted above, PDG refers to itself as PDGE in a number of documents submitted to the College

District and the California contractor's license used by PDG for the Project states that PDG is doing

business as PDGE.  See exhibit 1.

No. 14.  Identify all remote locations referred to in the first sentence of item four of the Form

10-Q attached to the accompanying Request for Admission.

**Comment:**  This interrogatory seeks clarification regarding which remote locations PDGE is

referring to in item four of Form 10-Q.  Of particular interest is whether the remote locations includes

the Las Vegas office of PDGE, which bid the subject project. It is hard to see how this request is

burdensome.

No. 15. Describe in detail all fraudulent activities identified in the internal investigation

referred to in the first paragraph of item 4 of the Form 10-Q attached to the accompanying Request for

Admission.

**Comment:**  Item four of the Form 10-Q refers to the "opportunity" of remote managers to

engage in fraudulent activities and it then describes by example a number of specific types of fraud.

Mr. Beresford's declaration submitted by PDG cites page 15 of the Form 10-Q to suggest that the

fraud was limited to the Seattle office of PDGE. Yet the discovery at issue refers to *item four* of the

-5-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

1    Report, which is on page 22, not note 10 on page 15, which is the extract relied upon by the declarant.

2    Item four of the Form uses the plural "remote locations" and "remote managers," clearly suggesting

3    that more than one office may have been involved in fraudulent activities.  Disclosing the results of the

4    PDG internal investigation should not be burdensome as this information is presumably summarized

5    in a report in PDG's files.

6        No.16. State whether all customer billings with regard to the Project were sent to the customer

7    from the corporate office.

8        **Comment:**  This interrogatory is limited to the Project involved in this case and it pertains to a

9    statement in item four regarding the lax accounting practices at PDGE.

10       No.17. Identify all actions taken by PDG Environmental, Inc. to remediate the control

11   deficiencies identified in the third paragraph of item four of the Form 10-Q attached to the

12   accompanying Request for Admission.

13       **Comment:**  Because item four in Report 10-Q is vague regarding dates, this interrogatory is

14   asking whether PDGE fixed the problems addressed in item four.  A follow up question would be:

15   when did any such fix occur and, in particular, whether any remedy occurred before the false claims

16   alleged in this case.

17       No. 18.  State each instance where PDG has billed customers for work never performed since

18   January 1, 2005.

19       **Comment:**  Item four of Form 10-Q clearly implies that PDG has billed customers for work

20   never performed on more than one occasion.  This interrogatory is limited in time and asks how often

21   that has occurred.  The burden of compliance should be minimal.

22       No.19. Has PDG ever been accused of submitting a false claim to a customer?

23       No.20.  If your answer to the above interrogatory is yes, state in detail each such instance

24

25       **Comment:**  Item four of Form 10-Q indicates that there may have been a pattern of fraud at

26   more than one of  PDG's remote locations.  This interrogatory asks if any customer has ever accused

27

28                                          -6-

     Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
                                                                  C 07-02987 WHA

PDG of submitting a false claim other than in this case. The College District is willing to limit this request to a specific time period, e.g. since January 1, 2005.

### Document Request Nos. 1-10

No.1.    All documents referring to the "material weakness" described in the first paragraph of item 4 of Form 10-Q attached to the accompanying request for admissions.

No.2.    All reports by PDG's auditors regarding the "material weakness" described in the first paragraph of item 4 of Form 10-Q attached to the accompanying request for admissions.

**Comment:**  These requests ask for documents that appear to form the basis for the statements in item four of the Form 10-Q. The report(s) should be easily accessible.

No.3.    All documents that discuss instances of suspected fraudulent activities by PDG employees since January 1, 2005.

**Comment:**  This request focuses on suspected fraud by PDG employees and is limited in time. The College District is willing to limit this to suspected fraud involving a customer of PDG.

No. 4.  All documents reflecting the internal investigation identified in the first paragraph of item 4 of Form 10-Q attached to the accompanying request for admissions.

**Comment:**  The last sentence of the first paragraph of item four says:  "Our internal investigation identified a number of fraudulent activities undertaken by one or more former employees which included fraudulent billing to customers."  It is assumed a report was prepared and this request asks for that document.

No. 5.  All documents that reflect any other investigation conducted on behalf of PDG with regard to suspected fraudulent actions by PDG employees.

**Comment:**  The College District is willing to limit this request to suspected fraudulent activities involving any customer of PDG which occurred on or after January 1, 2005.

No. 6.  All documents reflecting PDG's actions to remediate the control deficiencies described in item 4 of Form 10-Q attached to the accompanying request for admissions.

**Comment:**  This request is related to interrogatory 17, discussed above.

-7-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

No. 7.  All documents which discuss why PDG employees engaged in the fraudulent activities referred to in item 4 of Form 10-Q attached to the accompanying request for admissions.

Comment:  This request seeks the motive for the fraud:  was the fraud isolated instances of employees trying to enrich themselves or was it a reflection of corporate pressure to increase revenues?

No. 8.  All documents that were received by PDG's Las Vegas office since January 1, 2004 that describe policies and procedures for the bidding of public projects.

Comment:  The Las Vegas office bid the subject project.  As noted above, despite a discovery request on this subject, no document has been located regarding how PDG calculated its bid of $127,300 even though it is common sense that a written document would be created to show how a bid was calculated. I have asked PDG's counsel twice if the document was produced and I simply missed it. I have received no reply.   The only relevant document produced by PDG suggests that PDG bid the job at a loss of $46,000 (see exhibit 5).  This leads to the question of why would a financially precarious company bid a job at a far away location at a loss?  And would not that give PDG employees an incentive to submit suspect claims to make up the loss?  To help answer these questions, this document request seeks to determine the policies and procedures at PDG's Las Vegas office for bidding public contracts.  If there were any such policies and procedures, the next step would be to determine if they were followed in this case and, if not, why not.

No.9.   All documents that were received by PDG's Las Vegas office since January 1, 2004 that describe whether that office was expected to generate a certain amount of revenue per year.

Comment:  This request is limited in time and place and focuses on whether PDG's Las Vegas office was under pressure to generate certain revenues per year, which would give an employee an incentive to make low ball bids and false claims.

No.10. All documents identified in your answers to interrogatories.

Comment:  This request relates to the interrogatories discussed above.

-8-

10.     PDG states that, even if the above discovery is relevant or likely to lead to the discovery of relevant evidence, the discovery should be denied because of an undue burden. Yet PDG does not say which requests present the undue burden.  For example, admitting a document is true and correct (RFA No. 2) is not burdensome and many of the other requests are limited by date or place or both and should present minimal burden.  If PDG identifies which discovery is truly burdensome, the College District is willing to consider that request and limit the scope of the discovery.

11.     Mr. Beresford says in his declaration at paragraph 7 that the discovery is unduly burdensome because PDGE would need to obtain information "not under PDGE's control" which "could" cause PDG to expend a hundred man hours.  PDGE is not obligated, in my view, to produce material not in its custody or control so that objection does not appear well taken.  To the extent his overall undue burden contention is based on this premise, then it appears to be without merit.

12.     If PDG is claiming that the requested information is "confidential," as suggested on page 2 of Mr. Taylor's letter,  then it should identify which responses would trigger that confidentiality and, if a reasonable showing is made, the information could be produced to the College District pursuant to a protective order so as to preserve its confidentiality.

### Meet and Confer

13.     PDG's counsel, Mr. Brad Taylor, and I have discussed via email the College District's discovery described above that relates to the Form 10-Q.  In particular, on Wednesday, November 14, 2007, in response to an inquiry from Mr. Taylor, I sent him a lengthy email explaining why I believed the discovery at issue was proper.  A true copy of that email is attached hereto as exhibit 7

14.     Mr. Taylor attaches to his declaration an email that he says that he sent me on Friday November 16, 2007.  However, I have no record of having received that email.

-9-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

15.    I was on vacation with my family on November 19, 20, 21, 22, 23 and 24, 2007. This was the first vacation I have taken since September 7, 2006. I took the vacation in part because of the Thanksgiving holiday on November 22. (The SCLS law office was closed on November 22 and 23, 2007.) Because I was on vacation during the week of November 19, I was unable to respond to Mr. Taylor's telephone call that week. However, in all other instances, I believe I have been responsive to Mr. Taylor's inquiries.

I declare under penalty of perjury that the foregoing is true and correct and, as to those matter stated on information and belief, I believe them to be true.

Executed on 11/26/07 in Santa Rosa, California.

Patrick C. Wilson

-10-

Declaration of Patrick C. Wilson in Opposition to the Motion for a Protective Order
C 07-02987 WHA

EXHIBIT 1

SEP-13-2006 WED 01:11 PM SANTA ROSA JC        FAX NO. 7075274870        P. 02/04

License Detail                                                          Page 1 of 2

California Home                                          Wednesday, Septeml

## Welcome to California

**License Detail**
**Contractor License # 756281**

CALIFORNIA CONTRACTORS STATE LICEN

### DISCLAIMER

A license status check provides information taken from the CSLB license data base. Before
on this information, you should be aware of the following limitations:

- CSLB complaint disclosure is restricted by law (B&P 7124.6). If this entity is subject to
  complaint disclosure, a link for complaint disclosure will appear below. Click on the lin
  button to obtain complaint and/or legal action information.
- Per B&P 7071.17, only construction related civil judgments reported to the CSLB are
  disclosed.
- Arbitrations are not listed unless the contractor fails to comply with the terms of the
  arbitration.
- Due to workload, there may be relevant information that has not yet been entered ont
  Board's license data base.

Extract Date: **09/13/2006**

### * * * Business Information * * *

PROJECT DEVELOPMENT GROUP INC
dba P D G ENVIRONMENTAL INC
1386 BEULAH ROAD BUILDING 801
PITTSBURGH, PA 15235
Business Phone Number: (412) 243-3200

Entity: **Corporation**
Issue Date: **11/17/1998** Expire Date: **11/30/2006**

### * * * License Status * * *

This license is current and active. **All information below should be reviewed.**

### * * * Classifications * * *

| Class | Description |
|-------|-------------|
| B | GENERAL BUILDING CONTRACTOR |
| C21 | BUILDING MOVING, DEMOLITION |
| C-2 | INSULATION AND ACOUSTICAL |
| C51 | STEEL, STRUCTURAL |

PDG00708

09/14/2006    11:34    PDG ENVIRONMENTAL → LAS VEGAS    NO.518    P002

# STATE OF CALIFORNIA

# Contractors State License Board

Pursuant to Chapter 9 of Division 3 of the Business and Professions Code and the Rules and Regulations of the Contractors State License Board, the Registrar of Contractors does hereby issue this license to:

## PROJECT DEVELOPMENT GROUP INC dba P D G ENVIRONMENTAL INC

to engage in the business or act in the capacity of a contractor in the following classification(s):

**C51 - STEEL, STRUCTURAL**
**A - GENERAL ENGINEERING CONTRACTOR**
**HAZ - HAZARDOUS SUBSTANCES REMOVAL**

Witness my hand and seal this day,

**July 7, 2006**

**Issued November 17, 1998**

*Stephen P. Sands*
Registrar of Contractors

**756281**
License Number

SIGNATURE OF LICENSEE
DAVID P. BEARSFORD, SR    VICE PRESIDENT

SIGNATURE OF LICENSE QUALIFIER
ROBERT DENNIS RIZZO

This license is the property of the Registrar of Contractors, is not transferable, and shall be returned to the Registrar upon demand when suspended, revoked, or invalidated for any reason. It becomes void if not renewed.



State Of California
**CONTRACTORS STATE LICENSE BOARD**
**ACTIVE LICENSE**
Consumer Affairs

License Number **756281**    Entity **CORP**

Licensee Name **PROJECT DEVELOPMENT GROUP INC**
**DBA P D G ENVIRONMENTAL INC**

Classifications **8 ASB C21 C-2 C51 A HAZ**

Expiration Date **11/30/2006**

PDG00711

State of California



**Department of Industrial Relations**

DIVISION OF OCCUPATIONAL SAFETY AND HEALTH

# *Certificate of Registration*
# *for*
# *Asbestos-related Work*

Certificate No.   740       Expiration Date   21-Mar-07

## PROJECT DEVELOPMENT GROUP, INC. dba: PDG ENVIRONMENTAL, INC.
(Name of Employer)

is duly registered by the Division of Occupational Safety and Health in accordance with the California Administrative Code, Title 8, Article 2.5 for asbestos-related work.

06-Mar-06
Date Of Issuance

Division of Occupational Safety and Health

Effective Date   22-Mar-06       Contractor's License No.   756281

This registration is valid only when the following requirements and conditions are met:

1. The registered employer shall safely perform asbestos-related work in compliance with relevant occupational safety and health regulations.
2. The registered employer shall notify the Division of changes in work locations or conditions as specified by Section 341.9 of Title 8 of the California Administrative Code.
3. The registered employer shall post a sign readable at 20 feet at the location of any asbestos-related work stating:

   **Danger-Asbestos**
   **Cancer and Lung Hazard**
   **Authorized Personnel Only**

4. A copy of the registration shall be posted at the jobsite beside the Cal-OSHA poster.
5. The registered employer shall provide a copy of this registration certificate to the prime contractor and any other employers at the site before the commencement of any asbestos-related work.
6. The registered employer shall conduct a safety conference prior to the commencement of any asbestos-related work as specified by Section 341.11 of Title 8 of the California Administrative Code.
7. The registered employer acknowledges the Division's right to revoke or suspend this registration as provided by Section 341.14 of title 8 of the California Administrative Code.

Receipt of the following addenda is hereby acknowledged:

Addendum # __1__ Dated: __9/6/06__    Addendum # _____ Dated: _____
Addendum # __2__ Dated: __9/7/06__    Addendum # _____ Dated: _____
Addendum # _____ Dated: _____    Addendum # _____ Dated: _____

The undersigned further agrees, on the acceptance of this proposal, to enter into and execute the necessary contract with the necessary bonds and that in case of default in executing these documents within the time fixed by the instructions to bidders, the proceeds of the check or bond, accompanying this bid, shall become the property of the District.

SUBMITTED BY:    _____

                William Vasquez

COMPANY:    Project Development Group, Inc.

ADDRESS:    4640 Arville Street, Suite C

                Las Vegas, NV  89103

BY:    _____William Vasquez_____
            (Please Print or Type)

SIGNATURE:    _____

TITLE:    General Manager

DATE:    September 8, 2006

PHONE:    (702) 471-7233

Contractor's License No: 756281    Expiration Date 11/30/2006

PDG00011

 **PDGE**nvironmental, Inc.

## Form 25-1
## Daily Site Report

Project No. 06-7990    Project Name: Plover library

Date: 10-26-06    Shift Begin: 7:00 am pm    Shift End: 3:30 am pm

Day of Week: Thurs.    Crew Size: 8    Manhours this Shift: _____

Were you made aware of any incidents this shift?    ☑ Yes    ☒ No

Did any waste leave the site today?    ☐ Yes    ☑ No

If yes, what type:    ☐ Mold    ☐ Lead    ☐ Demolition    ☐ Asbestos

Work/Progress Description: On site crew putting
Drops and working on finalizing prep
10:30 Crew Ready to suit up Taking
lunch @ 10:45 ~~after lunch test~~
suited up 8 in cont begin w/ Removal
Removing white popcorn mat w/ hand
scrapers and wire brushing Remainder
down to stucco Skim coat as Removal
Progresses

Problems/Delays/Disputes: Pro

PDG ENVIRONMENTAL, INC.

PROJECT SET-UP / CHANGE FORM

COMPANY # _1_    DIVISION # _17_

ORIGINAL SET-UP ✓    CHANGE _____    CHANGE # _____

PROJECT NO: 06-7990    PROJECT NAME: Plover Library    PROJECT MANAGER: Brian C.
_____ / %    SALESMAN: Brian C.

| | | | | | |
|---|---|---|---|---|---|
| CONTRACT AMOUNT | 127,300 | PAY RATES LABORER | 28 | ST ___ OT ___ DT ___ |
| CONTRACT DATE | 9-6-06 | PAY RATES FOREMAN | 32 | ST ___ OT ___ DT ___ |
| COMPLETION DATE | TBD | DAILY PER DIEM RATE | N/A | |
| BILLING TYPE | Net 30 | CERTIFIED PAYROLL (Y/N) | N | |
| RETAINAGE (%) | 0 | UNION (Y/N) | Y | |
| PHASES (Y/N) | N | PROJECT SITE LOCATION (STATE) | CALAFORNIA | |
| BONDED PROJ. (Y/N) | Y | LOCALITY (COUNTY AND CITY) | Sonoma, Santa Rosa | |
| OT/DT PAY TERMS | Over 40 | TYPE OF WORK | Asbestos | |
| | | ESTIMATED MARGIN (%) | 25% | |
| | | CLIENT TYPE: | PRIVATE ___ PUBLIC ___ SCHOOL ✓ | |

---

**PHASE NO. _____**                     **COST ESTIMATE**

| | LABOR | | MATERIAL | SUBS | OTHER | TOTAL |
|---|---|---|---|---|---|---|
| | $ | HOURS | | | | |
| 1000 GEN CONDITION | | | | | | |
| 2000 MOBILIZATION | | | | | | |
| 3000 DEMO | | | | | | |
| 4000 SET UP | | | | | | |
| 5000 REMOVE/ENCAP | | | | | | |
| 6000 CLEAN UP | | | | | | |
| 7000 DISPOSAL | | | | | | |
| 8000 REINSULATION | | | | | | |
| 9000 AIR SAMPLING | | | | | | |
| 9100 EQUIPMENT | | | | | | |
| TOTAL | | | | | | |

If change from original bid contract amount or cost estimate, state the reason for the changes (attach memo if additional space required). _____

_____

_____

Attach a copy of the contract, purchase order, contract modification, change orders, and contract specification regarding billing and payment terms to this form.

PDG00080

**Billy Vasquez**

| | |
|---|---|
| **From:** | Billy Vasquez [bvasquez@pdge.com] |
| **Sent:** | Friday, January 19, 2007 1:35 PM |
| **To:** | 'Richard Behrens' |
| **Subject:** | SCAN0301_000.pdf |
| **Attachments:** | SCAN0301_000.pdf |

Mr. Behrens,
As per your request, all work copies of certs and medicals that completed project for the Plover Library asbestos abatement. I understand you had contact Mr. Brian Curtsinger ,Project Manager for PDGE, regarding release of 127,300.00 original contact billing. Please forward that payment to Project Development Group at the address on invoice. PDGE would like you to use overnite service. Please use this one time, PDG fed ex # 3330-3138-8.

I will expect to recieve payment next week sometime.


Thank you,
Billy Vasquez
PDGE

1/23/2007

EXHIBIT 2



**PDGE**
**Quote**
- Quote
- Real-Time Quote
- Options
- Snapshot

**Charts**
- Historical
- Real-time Intraday

**News & Info**
- Recent News
- Key Developments
- Message Boards

**Fundamentals**
- Company Report
- SEC Filings
- Earnings Estimates
- Financial Results
- Insider Trading
- Ownership

**Research**
- Advisor FYI
- CAPS
- StockScouter
- Analyst Ratings

**Guided Research**
- Research Wizard
- Expert Picks

**Find Stocks**
- Stock Screener
- Stock Power Searches
- Top-Rated Stocks
- Site Map

**Related Links**
- E-mail & Alerts
- IPO Center
- Capital Gains

Name or Symbol(s): PDGE  Go  Get Quote  Find Symbol  Add to MSN List  Print Report  Stock Alerts

PDGE quote (OTC BB Exchange - quotes delayed 15 min)                    Customize

**0.80** ▼ -0.05 -5.88%

| | | | |
|---|---|---|---|
| Previous Close | 0.85 | Bid | 0.80 |
| fyi Open | 0.80 | Bid Size | 2,500 |
| Day's High | 0.80 | Ask | 0.85 |
| Day's Low | 0.80 | Ask Size | 2,500 |
| Volume | 100 | 52 Week High | 1.20 |
| Avg. Daily Vol. (13 wk.) | 29,974 | 52 Week Low | 0.63 |

**PDGE Intraday Chart**

| | |
|---|---|
| Beta | 1.63 |
| Dividend & Yield | NA |
| Earnings/Share | -0.14 |
| Forward P/E | NA |
| Market Cap. | 16.61 Mil |
| P/E | NA |
| Return on Equity | -18.89 |
| Total Shares Out. | 20.77 Mil |

Last trade (extended hours) 10/23/2007 04:05 PM ET    Financial data in U.S. dollars

Your latest quotes: PDGE

More PDGE information: Charts | Key Developments | Company Report | Financial Statements

**Press releases**

PDG Environmental Awarded Reconstruction Contracts Worth $12.3 Million 10/23/2007 BusinessWire

PDG Environmental Announces Second Quarter Results 9/14/2007 BusinessWire

View all PDGE press releases

**Videos on MSN Money**

**Trading Day Ahead**
A look at the markets, with William Adams, JKV Global; John Brady, MF Global and CNBCs Bertha Coombs

- Productivity Days
- The Malls Got it All
- Market Buzz

more...

**Stock ratings**

CAPS   Community Stock Ratings
This stock has not been rated

CAPS Rating: NO RATING

0 users rated this stock

Rate this stock

Learn about CAPS | Today's Top Stocks

**StockScouter**

No stock rating information is available for this stock at this time.

Analyst recommendation
Recommendation: **Strong Buy**

View analyst ratings

**More information for PDGE**

**Financial highlights**

| | |
|---|---|
| Sales* | 84.52 Mil |
| Income* | -2.97 Mil |
| Sales Growth* | -4.10% |
| Income Growth* | +141.00% |
| Net Profit Margin | -3.51% |
| Debt/Equity Ratio | 1.14 |

* last 12 months

More financial information

**Funds that own PDGE**

| Fund Name | % Own |
|---|---|
| Perritt Emerging Opportunities Fund | 1.9 |

View all funds

advertisement

**653% Gains... and Counting**

Motley Fool co-founders David & Tom Gardner have a proven track record for picking stocks.

Their top six picks are up 140% to 653%; all rule-breaking mavericks poised for even higher growth.

Get their names – as well as David and Tom's #1 choices for 2008 and beyond—in their latest report, "The Motley Fool's 2 Top Picks." Yours FREE now.

**Click here for "The Motley Fool's 2 Top Picks!"**
*Returns as of 10/16/2007

Market update 9:51am ET

**Profit from China's nightmare**

Now you can make money by buying into the suppliers China needs to fuel its industrial growth.

Brush: Why gold's going straight to $1,000
Burns: Feds' budget tricks hide trillions in debt
Top Stocks blog: Time to say goodbye to Motorola

More market news

**Market Talk With Jim Jubak message board**

- MKT THOUGHTS //// WHERE FROM HERE... UP / DOWN ????
- Trouble at Fannie and Freddie means they can't bail out mortgage market
- Correction
- DWM - WisdomTree's "DEFA" ETF
- Invest in India

**Go to the Market Talk With Jim Jubak message board**

advertisement

Sponsored Links

**Turn $600 into $39,000**
The Forgotten Commodity - that could turn every $600 into $39,000!
www.VisionInvesting.com

**Beach Bum Earn $257K**
Proven system that will create massive wealth for virtually anyone!
www.NewBeachBum.com

**Earn 350K With Laptop**
Incredible Opportunity Fully Automated No Phone Calls Join Today
www.creatingsucessforyou.com

**Countrywide® Home Loans**
No Closing Cost Refinance Loan. Fast Approvals. Low Payments.
www.countrywide.com

**Data providers**
Data provided by Commodity Systems Inc. (CSI)
Analyst Recommendations data provided by Zacks Investment Research.
Copyright © 2007 Reuters. Click for Restrictions.
Quotes supplied by ComStock, an Interactive Data company.
StockScouter data provided by Gradient Analytics, Inc.
Page generated 12:51 PM Eastern Time

EXHIBIT 3

**Table of Contents**

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE QUARTERLY PERIOD ENDED July 31, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

FOR THE TRANSITION PERIOD FROM _____ TO _____

COMMISSION FILE NUMBER 0-13667

# PDG Environmental, Inc.

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**22-2677298**
(I.R.S. Employer Identification No.)

**1386 Beulah Road, Building 801
Pittsburgh, Pennsylvania**
(Address of principal executive offices)

**15235**
(Zip Code)

**412-243-3200**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicated by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See the definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☐      Non-accelerated filer ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

As of September 10, 2007, there were 20,765,276 shares of the registrant's common stock, par value $0.02 per share, outstanding.

Table of Contents

## PDG ENVIRONMENTAL, INC. AND SUBSIDIARIES
### STATEMENTS OF CONSOLIDATED OPERATIONS
### (UNAUDITED)

| | For the Three Months Ended July 31, | |
| --- | ---: | ---: |
| | 2007 | 2006 |
| | | (Restated) |
| Contract revenues | $26,638,000 | $22,428,000 |
| Contract costs | 22,597,000 | 19,134,000 |
| Gross margin | 4,041,000 | 3,294,000 |
| Selling, general and administrative expenses | 2,991,000 | 3,324,000 |
| Income (loss) from operations | 1,050,000 | (30,000) |
| Other income (expense): | | |
| Interest expense | (309,000) | (251,000) |
| Non-cash interest expense for preferred dividends and accretion of discount | (219,000) | (891,000) |
| Non-recurring charge for employee fraud | — | (251,000) |
| Interest and other income | 147,000 | 8,000 |
| | (381,000) | (1,385,000) |
| Income (loss) before income taxes | 669,000 | (1,415,000) |
| Income tax provision (benefit) | 164,000 | (182,000) |
| Net income (loss) | $  505,000 | $ (1,233,000) |
| Per share of common stock: | | |
| Basic | $    0.02 | $    (0.06) |
| Dilutive | $    0.02 | $    (0.06) |
| Average common share equivalents outstanding | 20,588,000 | 19,875,000 |
| Average dilutive common share equivalents outstanding | 759,000 | — |
| Average common shares and dilutive common equivalents outstanding for earnings per share calculation | 21,347,000 | 19,875,000 |

*See accompanying notes to consolidated financial statements.*

4

## ITEM 4. CONTROLS AND PROCEDURES

During the review of our consolidated financial statements as of October 31, 2006 and for the three and nine month periods then ended, our external auditors notified our management and Audit Committee of the existence of a "material weakness" in our internal controls related to the monitoring of remote locations. The Corporation's internal control system was designed such that general managers of remote locations had responsibility for authorizing and approving payroll charges for field employees, invoicing of customers, and collection of receivables for jobs originating in their office. This situation provided the opportunity for remote managers to engage in fraudulent activities, including fraudulent billing to customers for work never performed, payment to employees where no actual work was performed, payments received directly by former employees which were deposited in their bank accounts and preparation of supporting documentation and customer invoices submitted to the Corporate office for work that was not performed in order to substantially delay management from identifying the fraud. During the fourth quarter of fiscal 2007, we determined that it was necessary to restate our previously issued financial statements for the year ended January 31, 2006 and the quarters ended April 30, 2006 and July 31, 2006 to account for errors in the financial statements related to an employee fraud at our Seattle office. Our internal investigation identified a number of fraudulent activities undertaken by one or more former employees which included fraudulent billing to customers.

Our Chief Executive Officer and our then Principal Financial Officer concluded that the material weaknesses cited did compromise the financial reporting process resulting in the restatement of our consolidated financial statements as of January 31, 2006 and for the year then ended. To account for errors in the financial statements related to the employee's fraud at our Seattle office, we restated our previously issued financial statements for the year ended January 31, 2006 and for the quarters ended April 30, 2006 and July 31, 2006.

Our management has discussed this material weakness with the Audit Committee. Our management took certain actions to remediate these control deficiencies and has enhanced the monitoring and communication process with each remote location to better monitor branch operations. Specifically, management required that all customer billings be sent to the customer from the corporate office. Additionally, management enhanced the monitoring and communication process with each remote location to better monitor branch operations and we are in the process of making improvements to the payroll process relative to the tracking of time worked by our hourly employees.

In addition, during their audit of our consolidated financial statements as of January 31, 2007 and for the year then ended, our external auditors notified our management and Audit Committee of the existence of certain "material weaknesses" in our internal controls. The material weaknesses related to the lack of effective monitoring controls over financial reporting. Specifically they noted a general lack of internal review and approval regarding mechanical calculations, journal entries, and disclosure-related schedules resulting in significant adjustments to the financial statements. They also specifically stated the combination of a limited staff with adequate technical expertise and the transitional status of an interim Chief Financial Officer resulted in ineffective oversight and monitoring over the year end financial reporting process. Our prior Chief Financial Officer resigned suddenly on April 2, 2007, due to health reasons. They also notified us that there was a material weakness in the effective monitoring of remote locations. They stated that the decentralized structure of the Corporation creates internal control difficulties specifically within the monitoring function. The Corporation has not been able to identify or effectively manage commitments, contingencies and other significant matters.

In response to the identified material weaknesses, management, with oversight from our Audit Committee, is working to improve our control environment and to review, remediate and implement controls and procedures to satisfy the Corporation's requirement to be compliant with the internal control over financial reporting requirements of Section 404 of the Sarbanes Oxley Act of 2002 by January 31, 2008. In addition, we have recently hired a new Chief Financial Officer with 18 years of experience in the areas of accounting and finance. We intend to continue our efforts to implement process changes to strengthen our internal controls and monitoring activities.

As a consequence of the monitoring of remote locations material weakness noted above, we are applying other procedures designed to improve the reliability of our financial reporting. While our efforts to remediate this material weakness are ongoing, management believes that the financial statements included in this report are fairly stated in all material respects. We will continue to monitor the effectiveness of our internal control over financial reporting, particularly as it relates to the monitoring of remote locations, and will take further actions as deemed appropriate.

EXHIBIT 4

DATE:   7-Sep-06
JOB NAME:   **Plover Library**
JOB LOCATION:   Santa Rosa
BIDDATE:   11-Sep-06
ESTIMATOR:   Bill D.
CHECKED BY:

**ABATEMENT LABOR ITEMS**

| CODE | DESCRIPTION | AMNT | UNIT | PROD RATE | TOTAL HOURS | HOURLY COST | ITEM TOTALS |
|---|---|---|---|---|---|---|---|
| 4300 | SETUP | | | | | | |
| 4301 | PRE-CLEAN | 33500 | SF | 1000 | 33.5 | $33.00 | $1,105.50 |
| 4302 | DECON SET-UP | 1 | EA | 24 | 24.0 | $33.00 | $792.00 |
| 4302 | SHOWER | 2 | MH | 4 | 8.0 | $33.00 | $264.00 |
| 4303 | HEPA SET-UP | 20 | EA | 1.10 | 18.2 | $33.00 | $600.00 |
| 4304 | MASK CRITICALS | 32 | MH | 1 | 32.0 | $33.00 | $1,056.00 |
| 4305 | MASK FLOORS | 33500 | SF | 150 | 223.3 | $33.00 | $7,370.00 |
| 4306 | MASK WALLS | 40860 | SF | 125 | 326.9 | $33.00 | $10,787.04 |
| 4307 | SPLASHGUARD | 0 | SF | 200 | 0.0 | $29.00 | $0.00 |
| 4308 | SET UP LIGHTS/MISC | 16 | MH | 1 | 16.0 | $33.00 | $528.00 |
| 4309 | SET UP ROOF CONTAINM | 0 | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4310 | NON-CONTAMINATED DEMO | | | | | | |
| 4311 | DEMO CARPET | 6000 | SF | 200 | 30.0 | $33.00 | $990.00 |
| 4312 | DEMO TUBES & BALLASTS | 335 | EA | 9 | 37.2 | $33.00 | $1,228.33 |
| 4312 | DEMO LIGHTS | 335 | EA | 3 | 111.7 | $33.00 | $3,685.00 |
| 4313 | DEMO SHELVING | 500 | MH | 1 | 500.0 | $29.00 | $14,500.00 |
| 4314 | DEMO DOORS | 32 | EA | 3 | 10.7 | $33.00 | $352.00 |
| 4315 | DEMO  GYP. WALLS | 0 | SF | 80 | 0.0 | $29.00 | $0.00 |
| 4316 | DEMO  PLSTR. WALLS | | SF | 30 | 0.0 | $29.00 | $0.00 |
| 4317 | CABINETS, BATHROOMS | | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4319 | OTHER NON-CONT DEMO | 120 | MH | 1 | 120.0 | $33.00 | $3,960.00 |
| 4320 | CONTAMINATED DEMO | | | | | | |
| 4321 | DEMO CEILING | 12500 | SF | 100 | 125.0 | $33.00 | $4,125.00 |
| 4322 | REM PLSTR CLNGS/SOFIT | 36500 | SF | 30 | 1216.7 | $33.00 | $40,150.00 |
| 4323 | REM GYP.WALLS | 1200 | SF | 30 | 40.0 | $33.00 | $1,320.00 |
| 4324 | WINDOW PUTTY | 0 | SF | 6 | 0.0 | $29.00 | $0.00 |
| 4325 | DEMO DUCT | | LF | 1 | 0.0 | $29.00 | $0.00 |
| 4325 | CLEAN DUCT | | LF | 20 | 0.0 | $29.00 | $0.00 |
| 4326 | DEMO FIBERGLAS INSUL | | LF | 2 | 0.0 | $29.00 | $0.00 |
| 4327 | DEMO CONDUIT / MISC. | | SF | 500 | 0.0 | $29.00 | $0.00 |
| 4327 | DEMO PIPE / HVAC | | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4328 | PONY WALLS / CRITICALS | | SF | 12 | 0.0 | $29.00 | $0.00 |
| 4329 | OTHER CONT DEMO | | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4330 | TSI ABATEMENT | | | | | | |
| 4331 | GLOVEBAG TSI  <8" | | LF | 3 | 0.0 | $29.00 | $0.00 |
| 4332 | GLOVEBAG TSI  > 8" | | LF | 1 | 0.0 | $29.00 | $0.00 |
| 4333 | REMOVE TSI FITTINGS | 0 | EA | 3 | 0.0 | $29.00 | $0.00 |
| 4334 | REMOVE TSI < 6" | | LF | 10 | 0.0 | $29.00 | $0.00 |
| 4335 | REMOVE TSI 6" - 12" | | LF | 6 | 0.0 | $29.00 | $0.00 |
| 4336 | COOLING TOWERCAULK | 0 | LF | 25 | 0.0 | $29.00 | $0.00 |
| 4337 | CUT & WRAP PIPE/TSI | | LF | 10 | 0.0 | $29.00 | $0.00 |
| 4338 | REMOVE TANK/BOILER | | SF | 10 | 0.0 | $29.00 | $0.00 |
| 4339 | DUCT INSULATION | 0 | SF | 20 | 0.0 | $29.00 | $0.00 |
| 4340 | FIREPROOFING / SURFACING MATERIALS ABATEMENT | | | | | | |
| 4341 | REMOVE F/P DECK | | SF | 20 | 0.0 | $29.00 | $0.00 |
| 4342 | REMOVE F/P BEAMS | | SF | 20 | 0.0 | $29.00 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4343 | REMOVE F/P COLUMNS | | SF | 20 | 0.0 | $29.00 | $0.00 |
| 4344 | REMOVE LINOLEUM | 336 | SF | 30 | 11.2 | $29.00 | $324.80 |
| 4344 | REMOVE VAT | 5600 | SF | 80 | 70.0 | $33.00 | $2,310.00 |
| 4345 | REMOVE MASTIC | 5936 | SF | 80 | 74.2 | $33.00 | $2,448.60 |
| 4346 | SUPPORT BLASTER | 74.2 | MH | 1 | 74.2 | $33.00 | $2,448.60 |
| 4347 | BARRELL VAT | 0 | BLS | 5 | 0.0 | $29.00 | $0.00 |
| 4348 | REMOVE MASTIC CHEM. | 6 | EA | 1 | 6.0 | $29.00 | $174.00 |
| 4348 | REMOVE MASTIC BUFFER | | SF | 175 | 0.0 | $29.00 | $0.00 |
| 4349 | MASTIC TRIM | | LF | 25 | 0.0 | $29.00 | $0.00 |
| 4350 | **EXTERIOR ACM ABATEMENT** | | | | | | |
| 4351 | REM. ACM PAINT / BLAST | | SF | 150 | 0.0 | $36.00 | $0.00 |
| 4352 | SUPPORT BLASTER | 0.0 | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4353 | REM. ACM PAINT / MANUAL | | SF | 30 | 0.0 | $29.00 | $0.00 |
| 4354 | REMOVE ROOF MAT. | 0 | SF | 80 | 0.0 | $29.00 | $0.00 |
| 4355 | REMOVE ROOF GRAVEL | 0 | SF | 200 | 0.0 | $29.00 | $0.00 |
| **4360** | **LEAD ABATEMENT** | | | | | | |
| 4361 | REMOVE LEAD MISC. | 0 | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4362 | REMOVE LEAD WALLS | | SF | 45 | 0.0 | $29.00 | $0.00 |
| 4363 | REM LEAD CEILINGS | | SF | 50 | 0.0 | $29.00 | $0.00 |
| 4364 | REM LEAD COLUMNS | | MH | 35 | 0.0 | $29.00 | $0.00 |
| 4365 | REMOVE LEAD PIPES | | LF | 8 | 0.0 | $29.00 | $0.00 |
| 4366 | REM LEAD BOILER | | SF | 30 | 0.0 | $29.00 | $0.00 |
| **4370** | **CLEAN & LOAD OUT** | | | | | | |
| 4327 | CLEAN SUBSTRATE | 36500 | SF | 200 | 182.5 | $33.00 | $6,022.50 |
| 4328 | CLEAN CONTAINMENT | 36500 | SF | 500 | 73.0 | $33.00 | $2,409.00 |
| 4331 | BAG/DRUM MATERIAL | | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4339 | ENCAPSULATION | 36500 | SF | 400 | 91.3 | $33.00 | $3,011.25 |
| 4340 | DECON. EQUIPMENT | 0 | MH | 1 | 0.0 | $29.00 | $0.00 |
| 4341 | DUMP/LOADOUT 8% | 276.44 | MH | 1 | 276.4 | $33.00 | $9,122.43 |
| | 3731.90 | | | | | | |

| | | | | |
|---|---|---|---|---|
| **ABATEMENT LABOR** | | 3731.9 | | **$121,084.06** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **4100** | **SUPPORT LABOR** | | | | | | |
| 4102 | PREP/SUPERVISION | 160 | HR | 1 | 160.0 | $35.00 | $5,600.00 |
| 4100 | TOOL MAN | 0 | HR | 1 | 0.0 | $26.00 | $0.00 |
| 4103 | MOBILIZE OFF SITE | 32 | HR | 1 | 32.0 | $26.00 | $832.00 |
| 4104 | MOBILIZE ONSITE | 32 | HR | 1 | 32.0 | $28.00 | $896.00 |
| 4105 | DEMOB ON SITE | 32 | HR | 1 | 32.0 | $28.00 | $896.00 |
| 4106 | DEMOB OFF SITE | 32 | HR | 1 | 32.0 | $26.00 | $832.00 |
| 4107 | FRAME BARRIERS/ROOF | 0 | LF | 15 | 0.0 | $29.00 | $0.00 |
| 4108 | HANG BARRIERS/ROOF | 0 | SF | 100 | 0.0 | $29.00 | $0.00 |
| 4109 | ADDITIONAL HANDLING | | HR | 1 | 0.0 | $28.00 | $0.00 |
| 4101 | BUILD SCAFFOLD/DECK | | HR | 1 | 0.0 | $29.00 | $0.00 |
| | SUPPORT LABOR | | | 288.0 | | | $9,056.00 |

| | | | | |
|---|---|---|---|---|
| **TOTAL LABOR** | | 4019.9 | | **$130,140.06** |
| **NUMBER OF LABORERS FOR FOUR WEEKS** | | 23.3 | | |

**ABATEMENT MATERIAL**

| DESCRIPTION | QUANT | UNITS | TOTAL UNITS | UNIT COSTS | ITEM TOTALS |
|---|---|---|---|---|---|
| | | | | | |

Page 2

| Description | Quant | Unit | Rate | Total Units | Unit Cost | Item Total |
|---|---|---|---|---|---|---|
| TYVEK | 1166.220239 | EA | 1 | 1166.2 | $2.00 | $2,332.44 |
| DAILY GEAR | 466.4880955 | DY | 1 | 466.5 | $7.00 | $3,265.42 |
| TOWELS | 466.4880955 | DY | 1 | 466.5 | $0.70 | $326.54 |
| POLY 6 MIL | | RLS | 1 | 0.0 | $38.00 | $0.00 |
| POLY 6 MIL REINF | | RLS | 1 | 0.0 | $90.00 | $0.00 |
| POLY FR 4 MIL 12X100 | | RLS | 1 | 0.0 | $20.35 | $0.00 |
| POLY FR 4 MIL 20X100 | | RLS | 1 | 0.0 | $28.00 | $0.00 |
| POLY FR 6 MIL 12X100 | 42.46 | RLS | 1 | 42.5 | $52.00 | $2,207.92 |
| POLY FR 6 MIL 20X100 | 44.5 | RLS | 1 | 44.5 | $79.00 | $3,515.50 |
| POLY FR 10 MIL | | RLS | 1 | 0.0 | $114.00 | $0.00 |
| POLY FR REINF 6 MIL | | RLS | 1 | 0.0 | $152.00 | $0.00 |
| TAPE | 869.6 | RLS | 1 | 869.6 | $4.50 | $3,913.20 |
| SPRAY GLUE | 434.8 | CNS | 1 | 434.8 | $2.95 | $1,282.66 |
| GLOVEBAGS | 0 | EA | 1 | 0.0 | $3.40 | $0.00 |
| FIBER DRUMS | 0 | EA | 1 | 0.0 | $4.00 | $0.00 |
| STEEL DRUMS | 0.0075 | EA | 1 | 0.0 | $20.00 | $0.15 |
| BAGS 33 x 45 | 3960 | EA | 1 | 3960.0 | $0.66 | $2,613.60 |
| BAGS 36 X 60 | 3960 | EA | 1 | 3960.0 | $0.75 | $2,970.00 |
| D.O.P. TESTING | 0 | EA | 1 | 0.0 | $45.00 | $0.00 |
| PREFILTERS | 0 | EA | 1 | 0.0 | $0.58 | $0.00 |
| SECONDARY FILTERS | 0 | EA | 1 | 0.0 | $3.33 | $0.00 |
| HEPA FILTERS | 0 | EA | 1 | 0.0 | $120.00 | $0.00 |
| WATER FILTERS | 0 | EA | 1 | 0.0 | $15.00 | $0.00 |
| SMALL TOOLS & MISC | 4,019.90 | HR | 1 | 4019.9 | $0.60 | $2,411.94 |
| ENCAPSULANT | 0 | GL | 1 | 0.0 | $7.00 | $0.00 |
| ENVIROSAFE | 0 | GL | 1 | 0.0 | $9.00 | $0.00 |
| PEEL AWAY | 0 | GL | 1 | 0.0 | $15.15 | $0.00 |
| **B.B.'s** | | SF | 1 | 0.0 | $0.05 | $0.00 |
| DUMP FEES-FRI | 400 | CY | 1 | 400 | $35.00 | $14,000.00 |
| DUMP FEES-NON FRI | 40 | CY | 1 | 40 | $30.00 | $1,200.00 |
| DUMP FEES MILK RUN | | CY | 1 | 0 | $65.00 | $0.00 |
| DUMP FEES - MASTIC | 5 | DRM | 1 | 5 | $80.00 | $400.00 |
| METAL DUMPSTERS | 200 | YDS | 1 | 200 | $10.00 | $2,000.00 |
| DUMP FEES-CLEAN | 80 | CY | 1 | 80 | $15.00 | $1,200.00 |
| BAAQMD PERMIT | 4 | EA | 1 | 4 | $500.00 | $2,000.00 |
| PCB DISPOSAL | 335 | EA | 1 | 335 | $5.00 | $1,675.00 |
| TUBE DISPOSAL | 5360 | LF | 1 | 5360 | $0.20 | $1,072.00 |
| PCM | 77.74801591 | EA | 1 | 77.748016 | $9.00 | $699.73 |
| RAGS | 5 | CS | 1 | 5.0 | $25.50 | $127.50 |
| FOAM PACKS 12 OZ | | EA | 1 | 0.0 | $5.00 | $0.00 |
| FIT TESTS | | LS | 1 | 0.0 | $55.00 | $0.00 |
| BLOOD TESTS | | EA | 1 | 0.0 | $50.00 | $0.00 |
| PHYSICALS | | EA | 1 | 0.0 | $175.00 | $0.00 |
| **ABATEMENT MATERIAL** | | | | | | **$53,396.76** |

## EQUIPMENT / TRAVEL / OTHER

| DESCRIPTION | QUANT | UNIT | RATE | TOTAL UNITS | UNIT COSTS | ITEM TOTALS |
|---|---|---|---|---|---|---|
| TRUCK USAGE | | DAY | 1 | 0 | $25.00 | $0.00 |
| TRACK | | LF | 1 | 0 | $0.40 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| STUDS | | LF | 1 | 0 | $0.40 | $0.00 |
| GWB | | SF | 1 | 0 | $0.13 | $0.00 |
| F.R. STUDS | | LF | 1 | 0 | $0.80 | $0.00 |
| F.R. PLYWOOD | | SF | 1 | 0 | $0.85 | $0.00 |
| SHOT/PINS | | EA | 1 | 0 | $0.15 | $0.00 |
| SCREWS | | SF | 1 | 0 | $0.01 | $0.00 |
| BEAD BLAST RENTAL | | WE | 1 | 0 | $2,500.00 | $0.00 |
| SCISSOR LIFTS | | MO | 1 | 0 | $975.00 | $0.00 |
| JLG's | | MO | 1 | 0 | $975.00 | $0.00 |
| BOB CAT | 2 | WE | 1 | 2 | $250.00 | $500.00 |
| TRAILER HAUL | | LS | 1 | 0 | $1,800.00 | $0.00 |
| OFFICE TRAILER | | MO | 1 | 0 | $500.00 | $0.00 |
| SCAFFOLD RENTAL | 5 | LS | 1 | 5 | $200.00 | $1,000.00 |
| FENCE PANELS | | LF | 1 | 0 | $2.75 | $0.00 |
| FENCE -SOLID | | LF | 1 | 0 | $0.95 | $0.00 |
| HOUSING | | EA | 1 | 0 | $35.00 | $0.00 |
| SUBSISTENCE | 4019.9 | EA | 1 | 4019.9048 | $2.00 | $8,039.81 |
| AIRFARE | | EA | 1 | 0 | $250.00 | $0.00 |
| STREET BIN PERMIT | | EA | 1 | 0 | $250.00 | $0.00 |
| DEMO PERMIT(1%) | | EA | 1 | 0 | $2,500.00 | $0.00 |
| MISC MATERIALS | 0 | EA | 1 | 0 | $1.00 | $0.00 |
| EQUIP/TRAVEL/OTHER | | | | | | $10,350.69 |

| | | |
|---|---|---|
| **TOTAL OTHER COSTS** | INCL SALES TAX @ 8.5% | **$63,747.45** |

| | | |
|---|---|---|
| TOTAL DIRTY COSTS | | $174,480.82 |
| DIRTY OH&P | 22 % | $38,385.78 |
| DRTY INSURANCE PREMIUM | 2.3 % | $4,895.93 |
| **TOTAL DIRTY CONTRACT** | | **$217,762.53** |

| | | |
|---|---|---|
| TOTAL CLEAN COSTS | | $19,406.69 |
| CLEAN OH&P | 25 % | $4,851.67 |
| CLEAN INSURANCE PREMIUM | 2.3 % | $557.94 |
| **TOTAL CLEAN CONTRACT** | | **$24,816.31** |

| | | |
|---|---|---|
| **TOTAL INSURANCE PREMIUM** | | **$5,453.87** |
| LESS FET | 4 % | $218.15 |
| NET INSURANCE PREMIUM | | $5,235.72 |

| | |
|---|---|
| **RESTEC TOTAL NET PRICI** | **$242,578.84** |

**SUBCONTRACT ITEMS**

| SUBCONTRACTOR | TRADE | MARKL % | OH&P | BID AMT | | TOTAL PRICE |
|---|---|---|---|---|---|---|
| | | 15 % | | $0 | $0.00 | $0.00 |
| | | 15 % | | $0 | $0.00 | $0.00 |
| | | 15 % | | $0 | $0.00 | $0.00 |
| SUBTOTALS | | | | $0 | $0.00 | $0.00 |
| SUBS INSURANCE PREMIUM | | 1.32 % | | | | $0.00 |
| SUBS BONDS | | 0 % | | | | $0.00 |
| **SUBCONTRACT TOTAL PRICE** | | | | | | **$0.00** |

| | |
|---|---|
| CONTRACT NET PRICE | $242,578.84 |

| | | |
|---|---|---:|
| BOND | 1.7  % | $4,123.84 |
| **CONTRACT GROSS PRICE** | | **$246,702.68** |

| | | |
|---|---|---:|
| TOTAL OH&P | | $43,237 |
| PERCENTAGE OH&P ON SELL | | 17.53 |
| PERCENTAGE OH&P TO LABOR | | 33.22 |
| PERCENTAGE OF MATERIALS TO LABOR | | 48.98 |
| PERCENTAGE OH&P ON SELL ABATEMENT ONLY | | 17.82 |
| PRICE PER SQUARE FOOT WORK AREA | | $7.36 |

| | |
|---|---:|
| **LABOR WAGE RATE** | **$32.37** |
| **SELL PER MAN HOUR** | **$61.37** |
| **OTD RATE** | **8.3** |
| **DISPOSABLES / PROD. MH** | **$6.66** |

EXHIBIT 5

## AIG ENVIRONMENTAL / ENVIRONMENTAL BOND REQUEST FORM
### (Failure to Complete In Its Entirety Could Result in Non Approval of Bond)
*PLEASE TYPE & FAX TO CHERYL - 412-243-4900*

| | |
|---|---|
| PDGE Project No.: 06-7990 WON | PDGE Office Location: LAS VEGAS |
| Requestor=s Name: BRIAN CURTSINGER | Date of Request: 09-14-06 |
| Bid Date & Time: WON | Date Bond Needed: 09-20-06 |

Principal (PDGE Subsidiary Name): PROJECT DEVELOPMENT GROUP

Principal Address: 4640 ARVILLE ST #C LAS VEGAS, NV 89103

Obligee: SONOMA COUNTY JUNIOR COLLEGE DISTRICT

Obligee Address: 1990 ARMORY DR SANTA ROSA, CA 95401

| | |
|---|---|
| Obligee Contact: TIM BOSMA | Obligee Phone: 707-527-4422 |
| Obligee=s Fax #: 707-527-4870 | Contract Price: $ 127,300 |

| | | |
|---|---|---|
| Bond Form (Y or N)?: Y | # of Originals: 1 | Project # 611538 |
| Bid Bond % 10 | Performance Bond %: 100 | Payment Bond %:100 |
| Maintenance Bond %: N/A | Completion Time: 30 CAL. DAYS | Retainage: |
| Warranty: | Delay Damages: $ 400.00 / Per Day | |

Project Description (Complete Name & Address of Project Location): Remove and dispose of acoustical texture, linoleum tile and mastic. Plover Library 1501 Mendocina Ave Santa Rosa CA 95401

List Contamination:

### PROJECT BREAKDOWN

| | |
|---|---|
| Labor:      $65,000 | Is this a Plans & Specs Project? Y |
| Material:    $40,000 | Who Specifies When Site Clean? OWNER |
| Equipment: $30,000 | Who Selects Disposal Site? OWNER |
| Profit:       $38,300 | Does Independent Party Monitor Safety? Y |

What is Worker Protection Level (Circle One)?:      A      B      C      D

### SUBCONTRACTORS (Trade & Dollar Amount)

| | | |
|---|---|---|
| Name: N/A | Amount: $ | Bonded (Y/N): |
| Name: | Amount: $ | Bonded (Y/N): |
| Name: | Amount: $ | Bonded (Y/N): |

## ATTACH THE FOLLOWING CONTRACT SPECIFICATION PAGES
### Request Will Not Be Processed Without Pages

| ALL BOND REQUESTS | IF CONTRACT AMOUNT $1 MILLION OR MORE, ALSO ATTACH: |
|---|---|
| 1. Hold Harmless/Indemnification Pages | 1. Changed Conditions/Force Majeure Pages |
| 2. Warranties Pages | 2. All Bond Forms & Scope of Work Pages |

### FOR SURETY USE ONLY

PDG00902

EXHIBIT 6

## Patrick C. Wilson

**From:**    "Patrick C. Wilson" <pwilson@sclscal.org>
**To:**      "Brad Taylor" <btaylor@peelbrimley.com>
**Sent:**    Friday, November 09, 2007 8:39 AM
**Subject:** pdg document production

Brad:

I reviewed all of the documents that you produced via disk on behalf of PDG in response to my client's document request.

1)  I still have not received PDG's document response.  It is long overdue.

2)  The copies of the photos you produced do not have any dates on them.  When were they taken?

3)  Other than the daily reports, I could not find any notes taken by anyone from PDG, especially Billy Vasquez, regarding the project, including any notes reflecting Mr. Vasquez' meetings with College staff prior to the beginning of the work.  Also, wouldn't there be notes giving instructions to Chris Meade and the other employees who would be doing the work?  I did not see these in your document production.

4)  I could not find any pre-bid calculations and related documents showing how PDG arrived at its bid.   What labor was PDG assuming and for what tasks?  What material costs was PDG assuming and for what tasks? What equipment was PDG assuming and for what tasks?  What profit was PDG assuming and on what basis?

Perhaps I just missed these materials; if so, please tell me the document numbers and I can go back and review the materials you sent me.

I have sent out for numbering and copying the materials that you requested to be copied; they should be ready early next week.


Patrick C. Wilson
Senior Associate General Counsel
School and College Legal Services of California
5350 Skylane Boulevard
Santa Rosa, California  95403
(707) 524-2690
Fax:  (707) 578-0517
Email:  pwilson@sclscal.org

EXHIBIT 7

## Patrick C. Wilson

| | |
|---|---|
| **From:** | "Patrick C. Wilson" <pwilson@sclscal.org> |
| **To:** | "Brad Taylor" <btaylor@peelbrimley.com> |
| **Sent:** | Wednesday, November 14, 2007 1:55 PM |
| **Subject:** | College District's discovery to PDG |

Brad:

You have asked how the discovery relating to the PDGE 10-Q report filed by PDGE with the SEC is relevant to any claim or defense, or is propounded to lead to the discovery of relevant evidence.

PDG was the low bidder on the asbestos abatement project at the College District with a bid of **$127,300**.

As I indicated to you in my email dated November 9, 2007, I have reviewed all of the documents that you produced on behalf of PDG and I could not find *any* document that shows how PDG calculated its bid.  I asked you in that email to advise me if you in fact had produced those documents.  You have not replied so I assume that the bid preparation documents no longer exist.  This absence of any bid preparation documentation is highly irregular.  I would like an explanation.

You did produce a document (#108) from PDG to its bonding company dated 9/6/06 that shows that, just two working days before bid date, PDG had calculated its bid for this project as **$173,300**.  However, I could not locate any other documents showing how this bid amount was calculated (that is, what scope of work was assumed etc.).

The 9/6/06 bid amount was $46,000 higher than the final bid submitted by PDG. I have located no documents that show why PDG reduced its bid by 27%.  What is of particular interest is that the reduced bid of $127,300 was less than the profit identified in document number 108.  Why would PDG bid the College District job at a loss?  Any why wouldn't PDG have any documentation as to this bid calculation?

One reason to bid a job at a loss is to be the low bidder and then to make questionable claims during the job to try to make a profit.

One reason not to keep documentation as to how the bid was calculated is to eliminate evidence that shows that, for example, a later claim of "extra work" was in fact work that was factored into the bid.

As you know, the College District has alleged two false claims in its counterclaim.  In each instance, the District alleges that PDG claimed as extra work work that was within the scope of the contract.
The District alleges that PDG knew these claims were false, acted in deliberate ignorance of the truth or in reckless disregard for the truth.

The discovery I sent you is probative to these issues.  The 10-Q report  indicates that PDG "remote locations" engaged in pervasive fraud, including fraudulent billings to customers. The Santa Rosa project was bid by a "remote location", that is the Las Vegas office and we allege that PDG made false claims.

I'd like to know the full extent of the fraud discussed in the 10-Q report. This discovery may well show that the remote offices felt pressured to increase revenues due to PDG's fiscal problems to the extent that they low balled bids and then engaged in what PDGE has admitted was a fraudulent course of conduct.  One reason to do this would be  to generate extra revenue at a time when PDG was in financial trouble.   Thus, this discovery would support the claim that PDG knowingly submitted false claims to the College District.

Patrick C. Wilson
Senior Associate General Counsel
School and College Legal Services of California
5350 Skylane Boulevard
Santa Rosa, California  95403
(707) 524-2690
Fax:  (707) 578-0517
Email:  pwilson@sclscal.org